**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BEAM THERAPEUTICS INC.,<br>Plaintiff,<br>v.<br>ZI JUN (EMMA) WANG, YUXUAN (JENSEN) WU, SHANGHAI YAOTANG BIOTECHNOLOGY CO., LTD. a/k/a YOLTECH THERAPEUTICS, and SERAPHA BIO, INC.,<br>Defendants. | Civil Action No. ____________<br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Beam Therapeutics Inc. ("Beam"), for its Complaint against Zi Jun (Emma) Wang ("Dr. Wang"), Yuxuan (Jensen) Wu ("Dr. Wu"), Shanghai Yaotang Biotechnology Co., Ltd. a/k/a YolTech Therapeutics ("YolTech"), and Serapha Bio, Inc. ("Serapha") (collectively, "Defendants"), alleges the following.

## I. INTRODUCTION

1. This is an action for trade secret misappropriation and related claims arising from Defendants' unlawful acquisition, disclosure, and use of Beam's highly sensitive and commercially valuable confidential information and trade secrets. Beam's employee, Dr. Emma Wang, secretly founded a Chinese biotechnology company called YolTech while still working at Beam. During her short tenure at Beam, she engaged in unusual access to Beam's database, including accessing files unrelated to her duties at Beam, and accessing files outside of standard working hours. Then, only five months after leaving Beam, she filed patent applications on behalf of YolTech based on Beam's confidential and trade secret information. Now, YolTech has copied Beam's base editing platform and product pipeline and is selling one of its research programs—

one that competes directly with Beam—through a reverse merger with a newly-formed United States company, Serapha Bio, Inc. This action is an effort to stop the illegal use of Beam's information by Dr. Wang, Dr. Wu, YolTech, and Serapha.

2. Beam was founded in Cambridge, Massachusetts, in 2017 by pioneers in gene editing with the goal of creating precision genetic medicines through, in particular, a new method of repairing mutated gene sequences called base editing. At the time, base editors were laboratory tools capable of making a single nucleotide base change to DNA in a petri dish. Beam's founders saw what those tools could become: a means to correct disease-causing genetic mutations in brand new ways and, ultimately, to deliver cures to patients suffering from serious diseases that could not be cured by other available therapies. Beam's challenge was to transform a benchtop technique into safe and effective medicines for patients.

3. Over the ensuing years, Beam devoted substantial resources to that challenge through extensive research and development, and at a cost of hundreds of millions of dollars. Between 2019 and 2022 alone, Beam spent more than $850 million on research and development to industrialize base editing and delivery technologies. Beam also grew rapidly from approximately 15 employees shortly after its founding to more than 507 employees by 2022, including 301 employees devoted to research and development. The company built an integrated platform combining proprietary gene-editing technologies with advanced delivery and manufacturing capabilities—all three facets being required to make an effective and viable genetic therapy available to patients.




4. By the end of 2022, those efforts had yielded a robust pipeline of genetic medicines. The most advanced programs were (and still are) BEAM-101 for sickle cell disease, and BEAM-302 for alpha-1 antitrypsin deficiency (or "AATD"), a liver and lung disease.

5. It was against this backdrop that Dr. Wang joined Beam's Non-Viral Delivery group as a Scientist II, where she was employed from March 2021 to January 31, 2022. "Non-Viral Delivery" refers to a method of administering a base editor through the human body and into the particular type of cells where the base editor will do its work.

6. As a condition of her employment, Dr. Wang entered into a written agreement with Beam requiring her to protect Beam's confidential and proprietary information. Beam, in turn, entrusted Dr. Wang with access to valuable Beam Trade Secrets, including, among other things, information and know-how concerning Beam's LNP chemistry, formulation, screening, analytical methods, and chemistry, manufacturing, and controls.

7. Unbeknownst to Beam, and on information and belief, in July 2021—while Dr. Wang was still employed at Beam—Dr. Wu recruited Dr. Wang to co-found YolTech, a Chinese biotechnology company that, as Beam recently learned, was formed to do exactly what Beam was doing: develop *in vivo* base-editing therapies. Indeed, it is now evident that YolTech focused on

developing a program designed to treat Alpha-1 Antitrypsin Deficiency (AATD) that would ultimately emerge as a direct competitor to BEAM-302. Dr. Wu became YolTech's Chief Executive Officer, while Dr. Wang assumed the roles of Chief Technology Officer and Chief Development Officer. Dr. Wang never disclosed these roles to Beam. Instead, she concealed the fact that she had co-founded a separate biotechnology company and was simultaneously serving as its CTO and CDO while remaining employed by Beam.

8. Because she was a senior scientist working in the lab, Dr. Wang was given broad access to Beam's scientific research, including a credentialed account in Benchling. Benchling is an electronic laboratory notebook system through which Beam maintains electronic laboratory records. That access was granted so that she could perform her work for Beam. As Beam since has learned, in August 2021—approximately one month after she co-founded YolTech, and while she remained a Beam employee—Dr. Wang used that access in a manner that departed sharply from her ordinary work, retrieving and reviewing dozens of Beam records she had never opened before, across technical areas well beyond her own, including at night and on weekends.

9. When Dr. Wang left Beam unexpectedly in January 2022, she told Beam that she would be leading the manufacturing build-up for a new Chinese biotech company. She did not disclose that the company was YolTech, a company she had, on information and belief, co-founded months earlier while still employed at Beam and for which she had already been serving as Chief Technology Officer and Chief Development Officer. She also did not disclose she'd be working in base editing on a program that mimics BEAM-302.

10. YolTech began its operations in China, and it maintained a stealth profile within the U.S. biotechnology industry. Through at least February 2024, YolTech's website was published only in Chinese, did not identify Dr. Wang as a co-founder or as a member of its

management team, and listed YOLT-202 as an *in vivo* LNP-delivered product for hereditary disease whose specific indication was "UNDISCLOSED." Beginning in 2024, the company gradually increased its visibility among U.S. audiences, but revealed little about the substance of its pipeline. Public materials gave no indication that YolTech was pursuing an AATD program.

11. In June 2026, YolTech's AATD candidate, YOLT-202, featured prominently in a headline-grabbing licensing transaction announced by Serapha. Serapha is a brand new U.S. company founded for the purpose of introducing YolTech's stolen technology to the U.S. market. On June 23, 2026, Serapha, represented by Dr. Wang, announced that it had acquired the YolTech assets and Serapha would trade on Nasdaq under the ticker symbol "AATD." The transaction immediately drew attention in the biotech community because of Dr. Wang's involvement and because YOLT-202 bore striking similarities to Beam's own AATD base editing candidate, BEAM-302.

12. YOLT-202 is strikingly similar to BEAM-302. BEAM-302 is a liver-targeting lipid-nanoparticle formulation of base-editing reagents designed to correct the SERPINA1 (E342K) mutation that causes AATD. BEAM-302 is a highly valuable asset and is covered by numerous patents and pending applications within Beam's comprehensive base editing patent portfolio. YOLT-202 is likewise an *in vivo* base editor delivered in an "optimized lipid nanoparticle formulation designed for efficient hepatocyte targeting," and makes a precise single-nucleotide correction at the very same SERPINA1 E342K locus.

13. Following the June 2026 announcement, Beam investigated YolTech and its AATD program, and uncovered a YolTech patent application, filed on June 23, 2022— five short months after Dr. Wang left Beam—naming Dr. Wang as the sole inventor and published only in the Chinese language. That application incorporates and reflects Beam's trade secret information

concerning the design of delivery systems for base-editors, including specific structural features found in Beam's lead ionizable lipid, that could be used in delivering a base editor, that Dr. Wang learned as an employee of Beam.

14. In short, Dr. Wang learned what she needed to know at Beam, transported that information to YolTech to develop its AATD program, and then leveraged the same information in her executive role at Serapha. Her use of Beam's confidential information allowed YolTech to short-cut efforts necessary to develop not only their base editing platform, but also their LNP technology. Dr. Wu is a biologist and Dr. Wang is a formulation scientist—not a medicinal chemist. Yet in only five months, the company managed to design, synthesize, and test many novel lipids and file a patent application including a vast body of work on those lipids. Moreover, many of the lipids in that patent carry key structural similarities to Beam's lead lipid chemistry.

15. YolTech, Dr. Wu, and Dr. Wang have benefited enormously from their misappropriation. In exchange for granting Serapha an exclusive license to YOLT-202 outside China, a program Serapha subsequently renamed SERP-01, YolTech received an upfront cash payment, a minority equity stake in Serapha, and the right to receive more than $2 billion in potential regulatory and commercial milestone payments, along with additional royalties on future net sales of the product.

16. Serapha intends to advance the AATD program it purchased from YolTech in the United States, including through technology transfer activities and the initiation of a clinical trial in patients later this year. In doing so, Defendants seek to use trade secrets stolen from Beam to bring a competing AATD therapy to market on an accelerated timeline. The disclosure of Beam's trade secrets to YolTech and then to Serapha, a competitor with substantial financial resources, has caused and continues to cause harm to Beam by allowing Defendants to capitalize on years of

Beam's research, development, and investment without bearing the associated costs, risks, or effort.

17. Beam brings this action to stop the continued misuse of its trade secrets, to compel their return, and to recover the value Defendants have unlawfully extracted from Beam's investment.

## II. THE PARTIES

18. Plaintiff Beam Therapeutics Inc. ("Beam") is a Delaware corporation with a principal place of business at 238 Main Street, Cambridge, MA 02142.

19. Defendant Zi Jun Wang, also known as Emma Wang ("Dr. Wang"), is an individual who, on information and belief, resides at and owns a home in Lexington, MA. Dr. Wang was employed by Beam in Massachusetts from March 2021 until January 31, 2022, where she served as a Scientist II focused on non-viral delivery. In connection with that employment, Dr. Wang entered into an Employee Non-Solicitation, Confidentiality and Assignment Agreement with Beam (the "Agreement"). The Agreement is governed by Massachusetts law. Pursuant to the Agreement, Dr. Wang consented to the jurisdiction of the state and federal courts situated within Suffolk County, Massachusetts. On information and belief, Dr. Wang co-founded YolTech in July 2021, approximately six months before she left Beam, and thereafter served as YolTech's Chief Technology Officer and Chief Development Officer. Dr. Wang currently serves as Interim Chief Technology Officer of Serapha.

20. Defendant Yuxuan (Jensen) Wu ("Dr. Wu"), is an individual who, on information and belief, resides in China. Dr. Wu co-founded YolTech with Dr. Wang in July 2021 and continues to serve as YolTech's chief executive officer. On information and belief, Dr. Wu recruited Dr. Wang to co-found YolTech while she was employed by Beam in Massachusetts.

21. Defendant YolTech Therapeutics ("YolTech"), whose legal name is Shanghai Yaotang Biotechnology Co., Ltd., is a Chinese company with a principal place of business in Shanghai, China. On information and belief, YolTech was founded in July 2021 by Dr. Wu and Dr. Wang, and developed YOLT-202, an investigational therapy intended for treatment of AATD. On June 12, 2026, YolTech granted Serapha an exclusive license to rights to YOLT-202 outside of China in exchange for cash, equity in Serapha, milestone payments exceeding $2 billion, and royalties. YolTech has sought and obtained regulatory designations and clearances from the FDA for its investigational products, and those investigational products are the subject of clinical trials registered in the United States. On information and belief, Dr. Wu and Dr. Wang both hold meaningful financial stakes in YolTech.

22. Defendant Serapha Bio, Inc. ("Serapha") is a Delaware corporation with a principal place of business, on information and belief, at 11099 North Torrey Pines Road, Suite 150, La Jolla, California 92037. Serapha was co-founded in 2026 by RA Capital Management ("RA Capital"), an investment firm based in Boston, Massachusetts, and RTW Investments. Serapha has a pending reverse merger transaction with Boundless Bio, set to close later this year. Serapha holds the exclusive license to rights to YOLT-202 outside of China.

## III. JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over Beam's federal claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Beam's state law claims pursuant to 28 U.S.C. § 1367.

24. This Court has general personal jurisdiction over Defendant Dr. Wang because, on information and belief, she resides in Massachusetts.

25. This Court has personal jurisdiction over Dr. Wang because of Dr. Wang's written consent to the jurisdiction of the state and federal courts situated within Suffolk County,

Massachusetts, per Section 19 of the Agreement. A true and correct copy is attached hereto as Exhibit 1.

26. This Court has personal jurisdiction over Dr. Wang by virtue of her employment at Beam, a company with its principal place of business in Massachusetts, and because she entered into the Agreement with Massachusetts-based Beam to perform services on behalf of Beam.

27. This Court also has personal jurisdiction over Dr. Wang as she purposefully availed herself of the privilege of doing business in Massachusetts through her employment with a Massachusetts-based company and the claims alleged herein arise from and are related to her employment.

28. This Court also has personal jurisdiction over Dr. Wang because, as detailed *infra* § IV and Counts I and II, she performed acts of misappropriation of Beam's trade secrets, both on her own behalf and on behalf of Defendants Dr. Wu, Yoltech, and Serapha, including at Beam's headquarters in Cambridge, MA, which caused harm to Beam in the Commonwealth of Massachusetts.

29. This Court has personal jurisdiction over Defendant Dr. Wu because Dr. Wu has caused harm in Massachusetts through, among other things, his interference with a Massachusetts contract. On information and belief, Dr. Wu recruited Dr. Wang to co-found YolTech while Dr. Wang was still employed by Beam in Massachusetts and bound by the Agreement, which imposed obligations on Dr. Wang both during and after her employment with Beam. The Agreement is a contract with a Massachusetts company, governed by Massachusetts law, and containing Dr. Wang's consent to jurisdiction in Massachusetts. Section 17 of the Agreement obligated Dr. Wang to provide a copy of the Agreement to any prospective partner or coventurer (including Dr. Wu) prior to entering into such a business relationship. On information and belief, Dr. Wu therefore

knew of the Agreement, including Dr. Wang's consent to jurisdiction in Massachusetts, and knew or should have known that inducing Dr. Wang to breach the Agreement could involve him in litigation in Massachusetts. Dr. Wu's conduct caused Dr. Wang to breach that Agreement, both during and after her employment with Beam, and that breach—the injury on which Beam's claims are founded—occurred in Massachusetts.

30. This Court also has personal jurisdiction over Dr. Wu because he knowingly engaged in tortious acts primarily and substantially in the Commonwealth of Massachusetts, including by engaging Dr. Wang to commit acts of trade secret misappropriation in the Commonwealth of Massachusetts and directed at Cambridge, Massachusetts-based Beam.

31. This Court has personal jurisdiction over Defendant YolTech because YolTech has caused harm in Massachusetts through, among other things, its interference with a Massachusetts contract. YolTech was founded in July 2021 by Dr. Wang and Dr. Wu while Dr. Wang was still employed by Beam in Massachusetts and bound by the Agreement, which imposed obligations on Dr. Wang both during and after her employment with Beam. The Agreement is a contract with a Massachusetts company, governed by Massachusetts law, and containing Dr. Wang's consent to jurisdiction in Massachusetts. YolTech knew of the Agreement, including Dr. Wang's consent to jurisdiction in Massachusetts, by virtue of Dr. Wang's own knowledge of the Agreement she had signed and her role as a co-founder and director of YolTech, and by virtue of the knowledge of Dr. Wu, YolTech's co-founder and chief executive officer. YolTech therefore knew that causing Dr. Wang to breach the Agreement and to use Beam's confidential information on YolTech's behalf could involve YolTech in litigation in Massachusetts. YolTech's conduct, including its receipt and use of Beam's confidential information, caused Dr. Wang to breach that Agreement,

both during and after her employment with Beam, and that breach—the injury on which Beam's claims are founded—occurred in Massachusetts.

32. This Court also has personal jurisdiction over YolTech because it knowingly engaged in tortious acts primarily and substantially in the Commonwealth of Massachusetts, including by using Dr. Wang to commit acts of trade secret misappropriation in the Commonwealth of Massachusetts and directed at Cambridge, Massachusetts-based Beam.

33. This Court also has personal jurisdiction over YolTech because YolTech has sought out the benefits afforded by the United States' regulatory scheme. YolTech has deliberately and extensively engaged with the FDA to obtain the regulatory designations and clearances necessary to advance its investigational products toward commercial sale in the United States, including in the Commonwealth of Massachusetts. YolTech requested and received FDA Orphan Drug Designation for YOLT-202 and YOLT-203; FDA Rare Pediatric Disease Designation for YOLT-203; FDA Investigational New Drug clearance for YOLT-101, YOLT-202, and YOLT-203; and FDA Regenerative Medicine Advanced Therapy Designation for YOLT-203. On information and belief, YolTech participated in and directed the preparation, filing, and prosecution of these regulatory submissions; and continues to participate in seeking additional FDA clearances, designations, and approvals for those products; and, as to those product candidates for which it has not licensed United States rights to others, intends to participate in the clinical development, commercial marketing, offering for sale, and sale of those products throughout the United States, which would include in the Commonwealth of Massachusetts.

34. This Court has personal jurisdiction over YolTech because YolTech has purposefully directed clinical development activities toward the United States. YolTech's investigational products are the subject of at least five clinical trials registered on

ClinicalTrials.gov, a U.S. government-maintained clinical trial registry, with YolTech serving as the sponsor for three of those trials. Through those registrations, YolTech has solicited trial participation from patients, caregivers, and physicians throughout the United States, including in the Commonwealth of Massachusetts, and has made recruitment and contact information available to them. On information and belief, YolTech's recruitment efforts are not limited by geography and are open to and directed at United States residents, including residents of the Commonwealth of Massachusetts.

35. This Court has personal jurisdiction over YolTech because it has actively sought commercial opportunities in the United States. YolTech (successfully) sought U.S.-based partners to develop and commercialize its investigational products and promoted its business, pipeline, and clinical programs to U.S.-based investors, partners, and industry participants. YolTech promoted YOLT-202, its treatment for AATD, in the United States. AATD does not have a meaningful patient population in China.

36. This Court also has personal jurisdiction over YolTech because it entered into an exclusive licensing agreement with Serapha, a Delaware corporation co-founded by Massachusetts-based RA Capital Management, pursuant to which YolTech granted rights to develop and commercialize YOLT-202 outside China, including in the United States. Through that agreement, YolTech obtained and continues to hold substantial economic interests tied to the development, regulatory approval, and commercialization of YOLT-202 in the United States, including equity in Serapha, milestone payments, and royalties.

37. Alternatively, in the event the exercise of personal jurisdiction in this Court otherwise is not held to be proper based on YolTech's contacts with Massachusetts specifically, then, on information and belief, YolTech is not subject to jurisdiction in any state's court of general

jurisdiction and therefore personal jurisdiction over YolTech in this Court is proper pursuant to Fed. R. Civ. P. 4(k)(2) based on YolTech's contacts with the United States as a whole, including those alleged in paragraphs 31 through 36 above.

38. This Court has personal jurisdiction over Serapha because Serapha was formed and funded to serve as YolTech's United States commercialization vehicle for YOLT-202, which Serapha licensed from YolTech on June 12, 2026, and renamed SERP-01. YolTech retains a direct and continuing economic interest in the success of SERP-01 in the United States through its equity ownership in Serapha and its entitlement to regulatory and commercial milestone payments and royalties. Serapha's advancement of the clinical development, regulatory approval, and eventual commercialization of YOLT-202/SERP-01 in the United States directly serves YolTech's economic interests, and YolTech's United States interest in YOLT-202 is pursued through Serapha. Serapha is therefore subject to the jurisdiction of this Court to the same extent as YolTech.

39. This Court also has personal jurisdiction over Serapha because Serapha transacts business in the Commonwealth of Massachusetts. Serapha was co-founded in 2026 by RA Capital Management, an investment firm based in Boston, Massachusetts. Serapha solicited and obtained investment from RA Capital in Massachusetts, and did so to fund and further the acquisition and exploitation of YOLT-202—the product of the misappropriation alleged herein. Serapha's continuing development and commercialization of the misappropriated technology—the conduct giving rise to Beam's claims—is funded by that transaction of business in Massachusetts.

40. This Court also has personal jurisdiction over Serapha because Serapha knowingly engaged in tortious acts directed at the Commonwealth of Massachusetts, including by engaging Dr. Wang, a Massachusetts resident, as its Interim Chief Technology Officer after licensing

YOLT-202 from YolTech. On information and belief, Serapha engaged Dr. Wang with knowledge of her work at Beam and her central role in the development of YOLT-202 and the technology on which it is based, and Serapha has thereby benefited from and furthered the misappropriation of Beam's trade secrets. These acts were directed at, and caused harm to, Beam in the Commonwealth of Massachusetts.

41. This Court also has personal jurisdiction over Serapha because, as detailed infra § IV and Counts I and II, Serapha received, has used, and threatens to continue using Beam's trade secrets knowing, or having reason to know, that YolTech, Dr. Wang, and Dr. Wu conveyed and used those trade secrets through improper means and in violation of legal obligations owed to Beam, which caused harm to Beam in the Commonwealth of Massachusetts.

42. Venue is proper in this judicial District for all claims under 28 U.S.C. § 1391(b)(2), § 1391(b)(3), § 1391(c)(3). A substantial part of the events or omissions giving rise to Beam's claims occurred in this District: Beam is headquartered in Cambridge, Massachusetts; the trade secrets at issue were developed, maintained, and misappropriated in Massachusetts; the Agreement is a contract between a Massachusetts employee and a Massachusetts company, governed by Massachusetts law, in which Dr. Wang consented to the jurisdiction of the state and federal courts situated within Suffolk County, Massachusetts and waived any objection to venue in those courts; and Dr. Wu and YolTech induced Dr. Wang to breach that Massachusetts contract, causing injury to Beam in Massachusetts. Venue is further proper because, as alleged above, each Defendant is subject to this Court's personal jurisdiction with respect to this action.

## IV. BEAM'S INTELLECTUAL PROPERTY AND DEFENDANTS' MISAPPROPRIATION

### A. Beam and Its Proprietary Technology

43. Beam is a biotechnology company headquartered in Cambridge, Massachusetts. It was founded in January 2017 by leading scientists in gene editing to develop a new class of precision genetic medicines through base editing.

44. Base editing is capable of editing the genome at the level of a single nucleotide base, denoted by one of four letters A for adenine, G for guanine, C for cytosine, and T for thymine. Strands of DNA are made up of millions of base pairs, comprised of the A, G, C, and T bases. Mutations occur in human DNA. Often mutations are harmless, but sometimes, as is the case with AATD, a single base in the wrong place causes disease.

45. Base editors are capable of changing that single base back to the correct one, without requiring double-strand cuts to the DNA or RNA strands. At the time Beam was founded, base editing was a laboratory technique. Base editors were research tools, capable of making a single nucleotide change to DNA in a petri dish.

46. Beam's founders saw what those tools could become. Many genetic diseases are caused by a single-letter mutation among the billions of bases that make up the human genome. A base editor could in principle correct that mutation, such that the patient no longer carries the disease-causing mutation and no longer has the disease.

47. To realize that vision, Beam had to build the platform technologies necessary to translate base editing from a scientific concept into a potentially life-changing medicine for patients. Beam had to develop the technology to perform the actual edit (i.e., the payload). It also had to develop a method of transporting the editor to the appropriate cells and tissues in a living human being. Delivery technology is no small feat, as the human body wants to metabolize or rid itself of foreign bodies, like a base editor. And Beam had to be able to manufacture the resulting therapy to clinical and commercial standards. Each of those three facets—payload, delivery, and

manufacturing—is required for an effective genetic therapy, and none of them existed in usable form when Beam was founded. Beam has protected its investment in these facets with a broad and comprehensive patent estate, in addition to protecting certain aspects with trade secrets.

48. Over the five years following its founding, Beam devoted itself to that challenge, developing from an early-stage biotechnology company into a clinical-stage company. During that five-year period (from January 2017 through January 2022), Beam generated foundational technical know-how that laid the groundwork for its platform and therapeutic programs. Dr. Wang joined Beam in 2021 and remained there through January 2022, during this critical period of development, with access to Beam's foundational technical know-how.

49. Beam's work required extraordinary investment. Beam invested over $850 million in research and development between 2019 and 2022, with annual R&D expenditures rising from $54.6 million in 2019 to more than $300 million annually by 2021 and 2022. Beam also grew dramatically to 507 full-time team members by the end of 2022, including 301 employees devoted to research and development.

50. Throughout Beam's first five years, and throughout Dr. Wang's employment, Beam was actively developing and optimizing proprietary delivery technologies, focused on non-viral delivery. Non-viral delivery (as opposed to viral) uses synthetic materials—principally lipid nanoparticles, or "LNPs"—to shuttle genetic payloads into cells.

51. An LNP is a multi-component particle that encapsulates the base editor, protects the payload from degradation, and facilitates delivery to particular cells *in vivo*. Different LNP formulations have different biodistribution and tissue-targeting properties, making the identification of an LNP capable of delivering its payload to the desired tissue a critical part of the development process. An LNP has several different parts, each of which serves a different

function, and each of which can be swapped in or out for different genetic payloads and different targets inside the body. Designing an LNP that works to perform a particular task requires, among other things, the design and synthesis of an ionizable lipid, the selection of the other lipid components, the determination of the ratios in which those components are combined, the identification and optimization of formulations for delivery to particular tissues, the development of screening methods capable of discriminating among candidate formulations *in vivo*, and the development of the processes and conditions for producing the resulting LNP.

52. In 2021 and 2022, Beam was actively developing and optimizing proprietary LNP delivery technologies for liver-targeted delivery of base-editing reagents and exploring LNPs capable of targeting other tissues. Beam was specifically focused on developing an LNP that would work to deliver to the human liver the gene editor designed to treat AATD. Beam regarded its LNP technologies, formulations, screening methods, experimental results, and related know-how as among its most valuable proprietary assets.

53. Beam invested heavily in internal manufacturing capability as well. Beam viewed manufacturing know-how and control of its production processes as strategically important to the success of its platform and programs, and it built that capability in-house.

54. To that end, Beam constructed a 100,000 square foot GMP clinical and commercial manufacturing facility in Research Triangle Park, North Carolina, designed to support a broad range of clinical programs. The facility was built to manufacture products for Beam's *ex vivo* cell therapy programs in hematology and oncology and its *in vivo* non-viral delivery programs for liver diseases, with the ability to scale to support potential commercial supply.

55. During the same period, and during Dr. Wang's employment, Beam developed specialized manufacturing processes, technical expertise, and operational know-how relating to

genetic medicines, including mRNA manufacturing and the chemistry, manufacturing, and controls ("CMC") methods required to produce and release a LNP formulated genetic medicine. Beam considered this information proprietary and maintained it as confidential.

56. By the end of 2022, those efforts had brought Beam significantly closer to realizing its vision. Beam had built an integrated platform spanning gene editing, delivery, and manufacturing; was advancing both *ex vivo* and *in vivo* genetic medicines; and was moving its first programs from preclinical development into the clinic.

57. Since 2022, Beam has continued work on AATD and invested in BEAM-302 as Beam's lead genetic disease program. Dedicating nearly a decade of work to AATD research, Beam conducted a phase 1/2 human clinical trial, which showed positive treatment results in AATD patients and has now initiated its global pivotal cohort which is designed to support approval from the FDA.

**B. Beam's Trade Secrets**

58. Through the first five years of development work and investment described above, Beam developed extensive trade secrets concerning the payload, delivery, and manufacturing of genetic medicines.

59. Certain of those technologies became the subject of extensive patent coverage, granting Beam the exclusive right to practice those techniques.

60. Certain information, however, Beam kept secret. Beam's trade secrets, as relevant to this action, include at least the following categories, individually and in combination (collectively, the "Beam Trade Secrets"):

a. the specific structure of the ionizable lipid Beam uses as the most important element of its LNP for liver-targeted delivery, including for AATD;

b. the structures of the other ionizable lipids Beam designed, synthesized, and evaluated, and Beam's library of lipids and lipid formulations;

c. the synthetic routes, intermediates, reagents, and reaction conditions Beam developed to make its ionizable lipids;

d. the composition and component ratios of Beam's proprietary LNP formulations for liver-targeted delivery;

e. the methodology for screening and selecting among candidate ionizable lipids and candidate LNP formulations;

f. the results of that screening and selection work, including which formulations Beam advanced, which it abandoned, and the criteria on which those determinations were made;

g. the processes, parameters, and conditions Beam developed for producing its LNP formulations and for encapsulating base-editing payloads within them;

h. the equipment suitable for GMP manufacture of LNPs;

i. the design, selection, and optimization of Beam's base editors;

j. Beam's methods for engineering and optimizing the deaminase portion of the editors;

k. modifications to the Cas9 protein to optimize its targeting capabilities;

l. Beam's mRNA manufacturing processes, and the analytical and quality-control methods Beam developed for the mRNA component of its genetic medicines;

m. the design, selection, modification, and optimization of the guide RNAs used with Beam's base editors;

n. Beam's gRNA manufacturing processes, and the analytical and quality-control methods Beam developed for the gRNA component of its genetic medicines;

o. the design of Beam's *in vivo* studies evaluating targeted delivery and base editing, including studies in non-human primates, and the results of those studies;

p. the methods Beam developed to measure and characterize editing in target tissue, including its next-generation sequencing editing readouts, and the results those methods generated;

q. the immunogenicity and pharmacodynamic assays Beam developed to evaluate its LNP-delivered base editors, and the results of those assays;

r. chemistry, manufacturing, and controls ("CMC") analytical methods, release specifications, and stability data and protocols; and

s. negative know-how, including formulations, lipids, processes, and parameters that Beam determined did not work or did not work well, developed through years of trial and error.

61. Beam developed each category of the Beam Trade Secrets through extensive, expensive, and time-consuming development, engineering, and experimental work, including substantial trial and error. It was available only by doing the work, or by taking it from someone who had. It is important to note the importance of "negative know-how" since most research involves iterative testing; for example, one compound might show activity in a desired assay, while ninety-nine (or more) similar compounds show little or no activity in that assay. Therefore, knowing what "doesn't work" is very valuable. Beam extensively tested a number of lipids before deciding which to use in its clinical programs. Knowing which lipid structure would work best for base editing delivery and also knowing the many other candidate lipids that Beam tested and chose not to pursue is valuable confidential information.

62. Each category of the Beam Trade Secrets derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by others who can obtain economic value from its disclosure or use. Beam's competitive advantage in

precision genetic medicine rests directly on that secrecy, in addition to its extensive patent portfolio.

63. The Beam Trade Secrets are embodied, in part, in BEAM-302. BEAM-302 uses a liver-targeting LNP formulation to deliver the base-editing reagents. The development work that ultimately resulted in BEAM-302 included the same categories of proprietary information identified in Paragraph 60 above, including ionizable-lipid technology, LNP formulations and component ratios, screening and selection methods and results, and CMC methods for manufacturing and release.

64. Beam's success depends in part on its ability to obtain and maintain protection for its platform technology, its programs, and the know-how related to its business; to defend and enforce its intellectual property rights; and to preserve the confidentiality of its trade secrets.

65. Beam accordingly took, and takes, reasonable measures under the circumstances to keep the Beam Trade Secrets secret. Among other things, Beam requires confidentiality agreements with its employees, consultants, scientific advisors, and contractors. Beam further seeks to preserve the integrity and confidentiality of its data and trade secrets by maintaining physical security of its premises and physical and electronic security of its information technology systems. For example, Beam employs firewalling and security measures where electronic files are stored. Beam has invested significantly in IT security, including password protection. Beam also conducts periodic trainings with its employees on electronic security measures. For its electronic lab notebook systems, including Benchling, Beam employs login requirements for employees and requires employees to obtain and maintain security authorization for use of Benchling.

66. Beam maintained each of these protections during the period relevant to this Complaint, including throughout Dr. Wang's employment at Beam.

### C. Dr. Wang's Employment at Beam and Her Access to Beam's Trade Secrets

67. Beam employed Dr. Wang in Massachusetts as a Scientist II in Non-Viral Delivery from March 2021 until January 31, 2022. She worked at and from Beam's Cambridge, Massachusetts headquarters. In that role, Dr. Wang worked within the portion of Beam responsible for developing and advancing the delivery technologies used in Beam's precision genetic medicine programs.

68. In connection with her employment, on March 25, 2021, Dr. Wang executed the Agreement with Beam. The Agreement is governed by Massachusetts law.

69. Under the Agreement, Dr. Wang acknowledged that, during her employment, she would have access to Beam's confidential and proprietary information (defined in the Agreement as "Proprietary Information") and agreed, among other things, to maintain the confidentiality of that information and to use it only in the performance of her duties for Beam. Ex. 1, §§ 1-2. She further agreed, upon termination of her employment, to return all Beam property and materials in her possession, custody, or control containing proprietary information. Ex. 1, § 2. Dr. Wang also agreed to maintain adequate and current records of all proprietary information and developments created during her employment, which records would remain Beam's sole property. Ex. 1, § 6. Wang also agreed to devote her full-time efforts to Beam and to refrain from engaging in any other business activities that conflicted with her duties to Beam, and to advise Beam of any activity of Beam or its affiliates, or another business, that presented her with a conflict of interest or the appearance of a conflict of interest. Ex. 1, § 4. Finally, she agreed, for twelve months following the termination of her employment, to notify Beam of any new employment or business activity, including the name and address of each new employer or other post-Beam employment plans and the nature of her activities. Ex. 1, § 16.

70. When she started at Beam, Beam asked Dr. Wang to disclose any inventions or improvements relevant to the subject matter of her employment at Beam that she had come up with prior to her work for Beam. She said she had never invented anything related to her work at Beam before she started working there. She agreed that any new invention or development she worked on during the time she was employed by Beam would belong to Beam, so long as it related to Beam's work. She further agreed to disclose to Beam all inventions, discoveries, and developments conceived or reduced to practice during her employment (defined in the Agreement as "Developments"), and to assign to Beam all such Developments relating to Beam's business (defined in the Agreement as "Company-Related Developments").

71. Dr. Wang further agreed, before entering into any business relationship with a prospective partner or coventurer, to provide that prospective partner or coventurer with a copy of the Agreement. Ex. 1, § 17.

72. By virtue of her position, Dr. Wang was given access to Beam's non-viral delivery technology and to Beam's other confidential information. By virtue of her work for Beam, Beam trusted her with access to the Beam Trade Secrets.

73. That access was granted on the express condition that Dr. Wang use the information solely for Beam's benefit and maintain it in confidence.

74. Dr. Wang resigned from Beam effective January 31, 2022. She told Beam that she would be leading the manufacturing build-up for a new Chinese biotech company. Nothing about her account was remarkable on its face. Scientists routinely move between companies while continuing to work in the same broad area of technology, including delivery technology. What Dr. Wang did not say was that the "new Chinese Biotech company" was YolTech, that she had, on information and belief, co-founded it months earlier, while employed by Beam.

### D. Defendants Dr. Wang, Dr. Wu, and YolTech Conceal Their Misappropriation of Beam's Trade Secrets

75. For years after Dr. Wang left, Beam had no reason to connect YolTech to Beam's work, or to Dr. Wang. Defendants took deliberate steps to conceal Dr. Wang's role at YolTech from the United States biotechnology industry, and from Beam in particular.

76. Dr. Wang never disclosed to Beam that she had co-founded YolTech. She never disclosed that she was simultaneously serving as YolTech's Chief Technology Officer and Chief Development Officer while employed by Beam. She never disclosed that YolTech was organized to develop LNP-delivered *in vivo* gene editing therapies. She never disclosed that she would be working on AATD. And when she resigned, she described her next role in terms that omitted every one of those facts.

77. On information and belief, from YolTech's founding through at least February 21, 2024, YolTech's website was published only in Chinese and did not identify Dr. Wang as a co-founder or as a member of YolTech's management team. A true and correct copy of the YolTech website as captured by the Internet Archive's Wayback Machine on February 21, 2024, is attached hereto as Exhibit 2.

78. As of that date, the website described the company's founding team as including individuals from academia and industry. It did not identify any member of YolTech's management team by name. The website did, however, describe an unnamed member whose background and responsibilities correspond to Dr. Wang's—someone with experience at a US gene editing company, now at YolTech working on process optimization and scale-up.

79. Beyond what YolTech omitted from its website, Defendants took additional deliberate steps to conceal Dr. Wang's role. When Defendants disclosed her founding role at

YolTech at all, they did so in biotechnology trade press directed solely to the Chinese market, while withholding it from biotechnology trade press directed to the U.S. market.

80. YolTech's selective disclosure is reflected in two interviews Dr. Wu gave within days of each other in December 2023. The first was given to BioSpace, an English-language publication directed to the U.S. life sciences industry. The second was given to ByDrug, a Chinese-language publication directed to the Chinese biotechnology industry.

81. In the BioSpace English interview, Dr. Wu identified himself as "Founder and CEO of YolTech." He did not mention Dr. Wang at all, let alone identify her as a co-founder or describe her contributions to YolTech. A true and correct copy of that interview is attached hereto as Exhibit 3.

82. The ByDrug Chinese interview presented a different account. It introduced Dr. Wang as a co-founder and described her work in detail. Dr. Wu stated that YolTech was fortunate to have had Dr. Wang as a co-founder from its founding, described her as having many years of experience in the North American mRNA drug and *in vivo* gene editing drug industry, and credited her with leading the team that developed YolTech's *in vivo* gene editing drug production system and CMC within two years. A true and correct copy of that interview is attached hereto as Exhibit 4. Beam did not know of this Chinese-language-only interview, nor have reason to translate it to English, until it recently began to investigate Dr. Wang's hidden connection to YolTech.

83. Beginning in 2024, YolTech gradually increased its visibility among United States audiences, but revealed little about the substance of its product pipeline. On January 2, 2024, YolTech issued a PR Newswire announcement, explaining that YolTech had developed more than ten genetic-medicine programs. YolTech reported that its lead *in vivo* gene-editing candidate, YOLT-201 for transthyretin amyloidosis, had received regulatory acceptance in China in

December 2023, with an investigator-initiated trial underway and a first patient dosed. The release gave no indication that YolTech also was pursuing an AATD program.

84. As of at least February 21, 2024, YolTech's all-Chinese website identified YOLT-202 as an *in vivo* LNP-delivered product for hereditary disease, but listed its specific disease indication as "UNDISCLOSED." In other words, YolTech was working on YOLT-202 (the AATD program) but hiding that it was actually an AATD program. A true and correct copy of the Pipeline page of YolTech's website, as captured by the Internet Archive's Wayback Machine on February 21, 2024, is attached hereto as Exhibit 5.

85. Dr. Wang first appeared in the English-language trade press in connection with YolTech on May 8, 2024, when Endpoints News, a biopharmaceutical industry publication, published an article identifying her as YolTech's Chief Technology Officer. The article did not identify her as a co-founder of YolTech, and made no mention of AATD.

86. Only in September 2025 did YolTech post a clinical trial for its AATD candidate, YOLT-202, on ClinicalTrials.gov. That study, NCT07193615, is a single-arm, open-label, single-dose, dose-escalation exploratory study to evaluate the safety and tolerability of a single dose of YOLT-202 in patients with AATD.

87. In February 2026, Beam filed its Annual Report on Form 10-K identifying YolTech as a competitor. In that filing, Beam listed YolTech among companies utilizing base editing technologies, and among the companies of which Beam was aware that have approved therapies, have therapies in development, or may emerge in the future, in two disease areas: sickle cell disease and AATD.

### E. Dr. Wang, Dr. Wu, and YolTech Sell the Fruits of Their Misappropriation to Serapha for Development in the United States

88. Dr. Wang, Dr. Wu, and YolTech now seek to capitalize on their blatant theft of Beam's Trade Secrets.

89. Defendant Serapha Bio, Inc. is a private clinical-stage company co-founded by the investment firms RTW Investments and RA Capital Management.

90. On June 12, 2026, Serapha and YolTech entered into an Exclusive License Agreement. Through that agreement, Serapha obtained rights outside China to develop and commercialize YOLT-202 for AATD, which Serapha renamed SERP-01. In exchange, YolTech received an upfront cash payment and a minority equity stake in Serapha, and became eligible to receive regulatory and commercial milestones totaling more than $2 billion, plus tiered royalties on net sales of an AATD therapy.

91. On information and belief, Serapha was formed and funded to serve as YolTech's United States commercialization vehicle for YOLT-202. YolTech retains a direct and continuing economic interest in the success of the AATD program in the United States through its equity stake in Serapha and its entitlement to regulatory and commercial milestone payments exceeding $2 billion and tiered royalties on net sales. On information and belief, Dr. Wang and Dr. Wu stand to benefit financially both from YolTech's licensing transaction with Serapha and from Serapha's eventual commercialization and sale of an AATD therapy.

92. Beam learned of the transaction eleven days later. On June 23, 2026, Boundless Bio, Inc. and Serapha issued a press release titled "Boundless Bio and Serapha Bio Announce Merger Agreement and $230 Million Concurrent Private Placement," announcing a definitive merger agreement pursuant to which Serapha will combine with Boundless Bio in an all-stock merger, together with $230 million in concurrent private placement commitments. Upon

completion, the combined company plans to operate under the name Serapha Bio, Inc. and to trade on Nasdaq under the ticker symbol "AATD."

93. On the same day, Boundless Bio and Serapha held a conference call to discuss the merger. On that call, Dr. Wang was introduced as Interim Chief Technology Officer of Serapha, and she personally presented Serapha's strategy and pipeline to investors. A true and correct copy of the transcript of that conference call is attached hereto as Exhibit 6.

94. During the call, Dr. Wang discussed the AATD program with investors, providing additional details about the program that had not previously been disclosed. She explained that the program uses YolTech's "proprietary adenine base editor," delivered through an "optimized lipid nanoparticle [LNP] formulation designed for efficient hepatocyte targeting," to make a precise single-nucleotide correction at the SERPINA1 E342K mutation that causes AATD. Dr. Wang also disclosed Serapha's plans to advance the AATD program in the United States, including through CMC technology transfer and the initiation of a Phase 2 open-label study toward the end of 2026.

95. On August 17, 2026, concerned about this newly-learned information, Beam sent a letter to Dr. Wang, YolTech, Serapha, and Boundless Bio, expressing concern about Dr. Wang's access to Beam's trade secrets, and the obvious overlap between Beam's AATD program and Serapha's. Although YolTech's CEO responded to say he had received the letter, no other Defendant responded at all to Beam's outreach. The YolTech CEO did not provide a substantive response or explanation of whether YolTech's behavior was indeed an illegal misappropriation of trade secrets.

96. Through its exclusive license agreement with YolTech, Serapha received Beam trade secret information (including the Beam Trade Secrets), knowing or having reason to know

that Dr. Wang, Dr. Wu, and YolTech had acquired those trade secrets through improper means and in violation of legal obligations owed to Beam. Serapha's use and disclosure of that information is ongoing and will continue and expand as Serapha undertakes the CMC technology transfer from YolTech and advances its AATD program.

97. On information and belief, the chemistry, manufacturing, and controls information to be transferred from YolTech to Serapha incorporates and reflects the Beam Trade Secrets, including, for example, Beam's CMC analytical methods, release specifications, and stability data and protocols, and the processes, parameters, and conditions Beam developed for producing its LNP formulations and for encapsulating base-editing payloads within them.

**F. Beam's Investigation of the Misappropriation**

98. The news of YolTech's licensing deal with Serapha came as a shock to Beam.

99. Around the time of the June 2026 Serapha announcement, the biotech industry expressed similar shock regarding Dr. Wang's behavior, and immediately connected her knowledge back to Beam. For example, an individual who goes by @RNAiAnalyst commented that Dr. Wang deleted her LinkedIn profile and suggested a jury might soon be looking into Dr. Wang's employment history:


Dirk Haussecker @RNAiAnalyst · Jun 24
$bold can anybody find Zi Yun (Emma) Wang, founder of Yoltech and now CDO and CTO, on LinkedIn any more? I can't.

In any case, a jury certainly would take interest in her having been employed at Beam Therapeutics before (based on LinkedIn info earlier today).

This post cannot be displayed

Experience (6)

CDO & CTO
YolTech Therapeutics · Full-time
2022 - Present · 4 yrs 6 mos
Boston, Shanghai

Scientist II, Non-Viral Delivery
Beam Therapeutics · Full-time
2021 - 2022 · 1 yr
Cambridge, Massachusetts, United States

Scientist II, Formulation and Bioprocess
Tessera Therapeutics
2020 - 2021 · 1 yr
Cambridge, Massachusetts, United States

Lead Scientist, Formulation and Bioprocess
Providence Therapeutics
2018 - 2020 · 2 yrs
Toronto, Ontario, Canada

Scientist, Analytical Development
Eurofins Alphora, Alphora Research Inc · Full-time
2017 - 2018 · 1 yr
Toronto, Canada Area

4 3 35 7K

Clearly, she was trying to hide her affiliations from Beam.

100. Serapha is now joining in hiding Dr. Wang's involvement. Although Serapha promoted Dr. Wang as the Interim Chief Technology Officer, she no longer appears on Serapha's website, and the site shows no Chief Technology Officer on the C-suite page:




101. YolTech also is in on the deception. Although Dr. Wang is, on information and belief, a co-founder of YolTech, she does not appear on the YolTech website. Yet Dr. Wu, her co-founder, features prominently on the YolTech website.



102. After the 2026 Serapha announcement, and in light of the similarity between YolTech's AATD program and Beam's own, Beam began to investigate YolTech, its AATD program, and Dr. Wang's activities.

103. Through that investigation, Beam learned, among other things: (a) that Dr. Wang had co-founded YolTech while still employed by Beam; (b) that approximately five months after leaving Beam, she filed a lipid patent application on YolTech's behalf (written in Chinese) listing her as the sole inventor; and (c) that, while still at Beam, Dr. Wang had engaged in unusual access to Beam files containing confidential and proprietary information.

**1. Dr. Wu Recruits Dr. Wang, and Together They Co-Found YolTech**

104. On information and belief, while Dr. Wang was still employed at Beam, Dr. Wu recruited her to co-found YolTech, a Chinese biotechnology company that, as Beam recently learned, was formed to do exactly what Beam was doing: develop *in vivo* base-editing therapies.

105. On information and belief, YolTech was founded in July 2021 by Dr. Wu and Dr. Wang. Its legal name is Shanghai Yaotang Biotechnology Co., Ltd., and its principal place of business is in Shanghai, China.

**2. Dr. Wang Uses Beam's Trade Secrets, Including in YolTech Patent Applications**

106. Approximately five months after her Beam employment ended, on June 23, 2022, Dr. Wang filed a Chinese patent application directed to lipid technology on behalf of YolTech. That application, No. 202210725548.7, is titled "Lipid compound, composition containing lipid compound and application." The patentee is YolTech (Shanghai) Biotechnology Co., Ltd. The sole named inventor is "WANG Zijun (王子君)," which is Dr. Wang's full name. A true and correct copy of the published application, CN 114989182 A, is attached hereto as Exhibit 7.

107. That filing is significant for at least three reasons. First, the application was filed only five months after Dr. Wang left Beam. The volume and scope of work reflected in that application could not have been performed by Dr. Wang working at YolTech from scratch during that approximately five-month period. Second, the application incorporates and reflects Beam Trade Secrets to which Dr. Wang had access during her employment, including Beam's confidential know-how concerning ionizable lipid structures, LNP formulations, synthesis and screening and selection methodologies, and negative know-how. Third, Dr. Wang was not a medicinal chemist—she was a formulation scientist. It is striking that she was the sole inventor on a patent application that was directed to novel chemical compounds.

108. The as-filed application discloses approximately 60 lipid compounds. It further contains numerous examples describing the synthesis of lipid compounds, the preparation of lipid nanoparticles, experiments assessing their properties, animal studies testing delivery using those lipid nanoparticles, and other related technical work.

109. The work reflected in that disclosure was substantial. Each of the approximately 60 disclosed compounds had to be designed, synthesized, purified, and characterized before it could be formulated or tested. The synthesis of a novel ionizable lipid is not a single step; it proceeds through intermediates, requires the selection of reagents and reaction conditions, and commonly requires iteration before a usable compound is obtained.

110. The application also reports liver-editing studies and animal data. That work required, in addition to the compounds themselves, the formulation of those compounds (the ionizable lipids themselves) into lipid nanoparticles (of which a lipid nanoparticle is just one element). The LNPs would also have to encapsulate a gene-editing payload, the administration of the resulting formulations to animals, and the measurement of editing in liver tissue. Each of those

steps required its own materials, methods, and experimental iteration, and each required time beyond that needed to make the compounds. Given the scope of work, even for an established biotechnology company, completion of the work in five months simply would not be possible.

111. On information and belief, Dr. Wang was working on her invention for YolTech while employed by Beam. That conclusion follows from the scope of the disclosure itself: the number of compounds synthesized, the formulation work those compounds required, and the *in vivo* liver-editing studies and animal data reported alongside them.

112. Roughly half of the approximately 60 compounds disclosed in the application have a structural motif that is included in the lipid that Beam was using for its *in vivo* programs at the time Dr. Wang was at Beam, thus giving YolTech a considerable head start. Dr. Wu acknowledged this head start in the ByDrug article, noting that Dr. Wang led the team to develop YolTech's *in vivo* gene editing drug production system and CMC. Dr. Wang had access to that structure and knew it to be a viable starting point for LNP delivery of base editors. On information and belief, the application incorporates and reflects the Beam Trade Secrets, including those categories identified in Paragraph 60 above concerning ionizable lipid structure, the composition and component ratios of Beam's proprietary LNP formulations for liver-targeted delivery, Beam's ionizable lipid synthesis and screening and selection methodology, and Beam's negative know-how. Yoltech has published information about the lipid it is using in its own *in vivo* base editing programs, and it is apparent that YolTech has continued to evolve the lipids in that patent application and is now using a lipid in its *in vivo* program that was generated from that headstart.

**3. Dr. Wang's Unusual Benchling Activity After Co-Founding YolTech**

113. Beam maintained its electronic laboratory records in a software platform called Benchling. Beam's scientists authored their experimental records in Benchling, and Beam's experimental protocols, results, analytical methods, and related technical records were stored there.

As alleged above, access to Benchling required a credentialed account, and Beam required its employees (including Dr. Wang) to obtain and maintain security authorization for its use. Beam employees did not have uniform access to Benchling; access varied based on an employee's role and responsibilities

114. Dr. Wang held a credentialed Benchling account during her employment at Beam. Given her seniority and the nature of her technical work, Dr. Wang's role required relatively broad access to, and permissions within, Beam's Benchling environment.

115. The Benchling system captures and stores the activity of each user, including which records a user accessed and when, whether the user created or modified a record or instead retrieved and viewed a record, and that searches were conducted.

116. During the month of August 2021 (and particularly on August 6, 2021), Dr. Wang's activity in Benchling departed from her prior pattern. Dr. Wang's activity shifted toward accessing and reviewing Beam's existing records rather than working on or modifying them. The volume of material she retrieved also departed from her prior pattern. Dr. Wang accessed a large volume of Beam records, including 46 items that she had never accessed at any earlier point in her employment. The breadth of records accessed also is notable. The records Dr. Wang accessed on August 6 spanned eight distinct technical topic areas. Those areas included ionizable lipid screens, non-human primate (NHP) *in vivo* studies, LNP formulation work, guide RNA sequences and scaffolds, *in vitro* transcription (IVT) reports for RNA synthesis, protein expression studies, NGS editing readouts, mRNA analytics and quality control, and immunogenicity assays. Several of those areas lay outside the delivery work Dr. Wang was employed at Beam to perform.

117. The timing of the activity was also inconsistent with the ordinary performance of her work. Dr. Wang accessed Beam's records outside ordinary working hours, including at night and on weekends.

118. Significantly, this activity occurred approximately one month after YolTech was founded in July 2021. At that time, on information and belief, Dr. Wang had co-founded YolTech, was serving as its Chief Technology Officer and Chief Development Officer, had disclosed none of that to Beam, and remained obligated under the Agreement to hold Beam's proprietary information in confidence, to use it only in the performance of her duties for Beam, and to devote her full-time efforts to Beam. Ex. 1, §§ 1–2, 4.

119. Dr. Wang thereby acquired Beam's confidential information and trade secrets. The records she retrieved and reviewed in August 2021 contained the Beam Trade Secrets, and on information and belief Dr. Wang retrieved and reviewed them for the purpose of acquiring their contents for use outside Beam and for the benefit of YolTech. On information and belief, she retained the information she acquired after her employment ended on January 31, 2022. The means by which she retained it and/or transferred it to YolTech (and/or to Serapha) is known to Dr. Wang and not to Beam.

**4. Beam's Discovery of the Misappropriation**

120. Beam did not discover, and in the exercise of reasonable diligence could not have discovered, Defendants' misappropriation until 2026.

121. Dr. Wang concealed her co-founding of YolTech and her service as its Chief Technology Officer and Chief Development Officer throughout the remainder of her employment at Beam, and concealed both facts, and the nature of YolTech's work, when she resigned on January 31, 2022.

122. Defendants concealed Dr. Wang's role from Beam and from the United States biotechnology industry. Through at least February 21, 2024, YolTech's website was published only in Chinese and did not identify Dr. Wang. Ex. 2. YolTech identified YOLT-202's indication as "UNDISCLOSED." Ex. 5. When Dr. Wang's founding role was disclosed at all, it was disclosed only in Chinese-language trade press and withheld from English-language trade press. Ex. 3; Ex. 4.

123. The June 23, 2022 patent application naming Dr. Wang as sole inventor was filed in Chinese and published only in Chinese. Ex. 7. Beam had no reason to search Chinese patent records for Dr. Wang's name, and no reason to translate Chinese-language trade press, before it learned of her connection to YolTech and AATD.

124. Following Serapha's announcement of its license of YOLT-202 and Dr. Wang's prominent appearance as Serapha's Interim Chief Technology Officer, Beam investigated YolTech's activities, sent a letter to Defendants on August 17, 2026, and filed this action.

## V. CLAIMS FOR RELIEF

### COUNT I
### Misappropriation of Trade Secrets
### Massachusetts Uniform Trade Secrets Act, Mass. Gen. Laws c. 93, § 42 et seq.
### (Against All Defendants)

125. Beam incorporates the preceding paragraphs 1-124 of this Complaint as if fully set forth herein.

126. Through years of work and hundreds of millions of dollars in research and development, Beam developed and owns confidential methods, techniques, processes, inventions, scientific and technical data, research and development information, and know-how, including the Beam Trade Secrets described *supra* § IV.B. This information was the product of extensive, expensive experimental work and substantial trial and error.

127. This information, including the Beam Trade Secrets, derives independent economic value, actual and potential, from this information not being generally known or readily ascertainable by proper means, by others who can obtain economic advantage from it. Beam took reasonable measures to protect this information at all relevant times, as described *supra* § IV.B. Dr. Wang was bound by the Agreement to protect Beam's confidential and proprietary information, use it solely for Beam's benefit, and return it upon termination. Her access to that information was expressly conditioned on those obligations.

128. Dr. Wang acquired, disclosed, and used Beam's trade secret information by improper means. Shortly after, on information and belief, secretly co-founding YolTech while still employed by Beam, Dr. Wang began retrieving and reviewing Beam records containing trade secret information, including records she had never previously accessed and records outside her technical role. Dr. Wang acquired and retained that information for YolTech's benefit and subsequently used and disclosed it in YolTech's patent filing and technology development. Dr. Wang's use and disclosure of Beam's trade secret information continues through her role as Serapha's Interim CTO.

129. Dr. Wu, YolTech, and Serapha each acquired, used, and/or disclosed Beam's trade secret information knowing, or with reason to know, that Dr. Wang had obtained and disclosed them in breach of her obligations to Beam. Dr. Wu and YolTech used Beam's trade secret information to develop YolTech's technology, including YOLT-202, and Serapha subsequently acquired and used that technology through its exclusive license with YolTech. Defendants' use and disclosure continues, including through CMC technology transfer from YolTech to Serapha. Defendants' use of Beam's confidential information has already provided benefit to them, and their continued use of this information will continue to harm Beam. Beam and Yoltech are two

companies pursuing base editors to treat AATD. Investors who wish to invest in base editors in the clinic to treat AATD can choose between the two companies. Dr. Wang's misuse of Beam confidential information has given Yoltech an unfair head start that allows Yoltech to draw investment away from Beam.

130. Defendants' conduct constitutes misappropriation of trade secrets in violation of Mass. Gen. Laws c. 93, § 42 et seq.

131. Defendants' misappropriation was willful and malicious.

132. Defendants' concealed their misappropriation from Beam as described *supra* §§ IV.D. and IV.F.4.

133. As a result of Defendants' misappropriation, Beam has suffered and continues to suffer damages and irreparable harm. For example, it has allowed YOLT-202 to get a head start, compared to a world in which misappropriation had not occurred. The Defendants' conduct in misappropriating Beam's trade secret information was undertaken willfully and maliciously thereby also entitling Beam to exemplary damages.

**COUNT II**
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.**
**(Against All Defendants)**

134. Beam incorporates the preceding paragraphs 1 - 133 of this Complaint as if fully set forth herein.

135. As alleged above, Beam owns trade secret information, including the Beam Trade Secrets, which Defendants misappropriated. Beam's trade secret information is related to products and services used in, and intended for use in, interstate commerce.

136. Defendants' conduct violated the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. Acts in furtherance of this offense were committed in the United States.

137. Defendants' misappropriation was willful and malicious.

138. Defendants' concealed their misappropriation from Beam as described *supra* §§ IV.D. and IV.F.4.

139. As a result of Defendants' misappropriation, Beam has suffered and continues to suffer damages and irreparable harm. For example, it has allowed YOLT-202 to get a head start, compared to a world in which misappropriation had not occurred. The Defendants' conduct in misappropriating Beam's trade secret information was undertaken willfully and maliciously thereby also entitling Beam to exemplary damages.

**COUNT III**
**Breach of Contract**
**(Against Dr. Wang)**

140. Beam incorporates the preceding paragraphs 1 - 139 of this Complaint as if fully set forth herein.

141. The Employee Non-Solicitation, Confidentiality and Assignment Agreement (the "Agreement") is a valid contract between Beam and Dr. Wang, and is supported by consideration.

142. Beam has at all times performed under the Agreement.

143. The Agreement prohibits Dr. Wang from, among other things, using or disclosing Beam's Proprietary Information outside the performance of her duties and, while employed, from engaging in business activities that conflict with those duties. It further requires her to devote her full-time efforts to Beam's business, to disclose all Developments conceived or reduced to practice during her employment, to assign to Beam all Company-Related Developments and related intellectual property rights, and, for twelve months following termination, to notify Beam of each subsequent employment or business activity, including the nature of her activities.

144. On information and belief, Dr. Wang has breached the Agreement by, among other things: (a) co-founding YolTech during the period of her employment with Beam; (b) using and disclosing Beam's Proprietary Information to Dr. Wu, YolTech and Serapha; (c) failing to disclose to Beam, and failing to assign to Beam, Company-Related Developments conceived or reduced to practice during her employment; (d) failing to notify Beam of her business activity at YolTech or the nature of her activities there; (e) failing, upon the termination of her employment, to return to Beam all Beam property and materials in her possession, custody, or control containing Proprietary Information; and (f) to the extent she did not provide Dr. Wu and YolTech with a copy of the Agreement before entering into a business relationship with them, failing to do so.

145. Beam has and continues to experience damages from Dr. Wang's contractual breaches.

146. Beam is entitled to damages and/or specific performance of Dr. Wang's assignment obligations under the Agreement, including an order directing Dr. Wang to assign to Beam, and to execute all documents necessary to effect assignment of, all right, title, and interest in Chinese patent application No. 202210725548.7, any patent issued thereon, and all members of its patent family, related applications, and foreign counterparts.

**COUNT IV**
**Tortious Interference with Contractual Relations**
**(Against Dr. Wu, YolTech, and Serapha)**

147. Beam incorporates the preceding paragraphs 1 - 146 of this Complaint as if fully set forth herein.

148. The Employee Non-Solicitation, Confidentiality and Assignment Agreement (the "Agreement") is a valid contract between Beam and Dr. Wang, and is supported by consideration.

149. The Agreement prohibits Dr. Wang from, among other things, using or disclosing Beam's Proprietary Information outside the performance of her duties and, while employed, from

engaging in business activities that conflict with those duties. It further requires her to disclose all Developments conceived or reduced to practice during her employment, to assign to Beam all Company-Related Developments and related intellectual property rights, and, for twelve months following termination, to notify Beam of each subsequent employment or business activity, including the nature of her activities.

150. On information and belief, Dr. Wu and YolTech had full knowledge of the Agreement at all relevant times. On information and belief, Serapha had full knowledge of the Agreement at all relevant times.

151. On information and belief, Dr. Wu and YolTech knowingly, intentionally, and willfully induced Dr. Wang to breach the Agreement by, among other things: (a) recruiting her to co-found YolTech, and having her serve in multiple C-suite roles while she was employed by Beam; (b) conferring on her founder's equity, officer titles, and compensation in exchange for the Proprietary Information she took from Beam and the Company-Related Developments she diverted from Beam; and (c) causing a patent application to be filed in YolTech's name on inventions Dr. Wang conceived or reduced to practice during her employment with Beam, and which she was obligated to disclose and assign to Beam.

152. Serapha knowingly, intentionally, and willfully induced Dr. Wang to breach the Agreement by, among other things, engaging Dr. Wang as its Interim Chief Technology Officer, and compensating her to advance in the United States the very program built on the Proprietary Information she took from Beam and the Company-Related Developments she diverted from Beam.

153. Defendants' conduct constituted improper interference with Dr. Wang's contractual obligations to Beam, and was done through improper means and/or with an improper motive.

154. As a result of Defendants' wrongful tortious interference with the Agreement, Beam has suffered and continues to suffer damages and irreparable harm.

155. For years, Defendants concealed their misappropriation of Beam's trade secrets, as described *supra* §§ IV.D. and IV.F.4.

**COUNT V**
**Unjust Enrichment**
**(Against All Defendants)**

156. Beam incorporates the preceding paragraphs 1 - 155 of this Complaint as if fully set forth herein.

157. As a result of the conduct described above, including Defendants' misappropriation and use of Beam's confidential information and trade secrets, each Defendant obtained benefits at Beam's expense, including but not limited to, business opportunities, scientific advantages, research and development savings and shortcuts, and for which Defendants have not paid and to which they were not entitled.

158. Defendants have improperly, and without Beam's consent, retained this Beam property, as well as the scientific and commercial benefits derived from such Beam property, to which they were not entitled.

159. Defendants had, and have, no legitimate entitlement to this Beam property or the advances, opportunities, patent rights, and revenues derived from such Beam property.

160. On information and belief, Defendants have continued to use the ill-gotten property and opportunities derived therefrom for their own benefit.

161. The taking and retention of this benefit is both inequitable and unjust.

162. As a direct and proximate result of Defendants' unjust enrichment, Beam has suffered substantial injury, including but not limited to the loss of commercial opportunities.

**COUNT VI**
**Unfair Competition and Unfair or Deceptive Acts in Conduct of Trade or Commerce**
**Mass. Gen. Laws c. 93A, § 11**
**(Against All Defendants)**

163. Beam incorporates the preceding paragraphs 1 - 162 of this Complaint as if fully set forth herein.

164. The parties are engaged in trade or commerce for purposes of M.G.L. ch. 93A, § 11. Beam, YolTech, and Serapha are each engaged in the conduct of trade or commerce. Dr. Wang and Dr. Wu are likewise engaged in trade or commerce. On information and belief, each co-founded YolTech in July 2021 and served as one of its officers—Dr. Wang as Chief Technology Officer and Chief Development Officer, and Dr. Wu as Chief Executive Officer—and, each holds a meaningful financial stake in YolTech and stands to benefit financially from YolTech's license of YOLT-202 to Serapha and from Serapha's eventual commercialization and sale of an AATD therapy. Dr. Wang further serves as Serapha's Interim Chief Technology Officer. The conduct alleged herein was undertaken by Dr. Wang in her capacity as a founder and officer of competing commercial enterprises, and not merely in her capacity as a Beam employee.

165. Defendants' misappropriation of Beam's Trade Secrets constitutes an unfair method of competition and an unfair or deceptive act or practice declared unlawful by M.G.L. ch. 93A, § 2.

166. Moreover, the Defendants' conduct in violation of M.G.L. ch. 93A took place primarily and substantially in Massachusetts. Beam's headquarters and principal operations are, and always have been, located in Massachusetts. Beam's misappropriated trade secrets were developed in Massachusetts and physically located in Massachusetts at the time they were stolen.

Dr. Wang was employed by Beam in Massachusetts at the time of the misappropriation, worked at and from Beam's Cambridge, Massachusetts headquarters, and acquired the Beam Trade Secrets there. Moreover, the harm to Beam and Beam's employees arising out of Defendants' tortious conduct will be felt principally in Massachusetts.

167. Likewise, Defendants have substantial connections to Massachusetts beyond their tortious conduct directed specifically at Beam and Massachusetts. Dr. Wang was a resident in Massachusetts at the time she misappropriated Beam's trade secrets, and on information and belief, currently resides in Lexington, Massachusetts. Dr. Wu and YolTech brought Dr. Wang on to co-found YolTech with knowledge that her misappropriation of Beam's trade secret information would occur from Massachusetts. Serapha was co-founded and funded in part by RA Capital Management, an investment firm based in Boston, Massachusetts, and Serapha thereafter engaged Dr. Wang, a Massachusetts resident, as its Interim Chief Technology Officer.

168. The Defendants' conduct in misappropriating Beam's Trade Secrets was undertaken willfully and knowingly, thereby also entitling Beam to an award of up to treble damages.

169. As a result of Defendants' unfair competition in violation of M.G.L. ch. 93A, § 2, Beam has suffered and will suffer irreparable harm, in addition to monetary damages, and has suffered a loss of money and property in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Beam Therapeutics Inc. respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

A. Entering a permanent injunction enjoining Defendants from using, copying, retaining, or further disclosing any of Beam's trade secret or confidential information, and from developing, marketing or selling any products containing, incorporating, or derived from Beam's trade secret or confidential information;

B. Ordering Defendants to identify all persons and entities to whom Beam's trade secret or confidential information has been disclosed;

C. Ordering Defendants to return all trade secret or confidential information to Beam, and to certify in writing, under oath, that all copies have been permanently deleted and destroyed, setting forth in detail the specific steps taken to accomplish such return and destruction, including the location of all files or storage media where such information was found and the identity of the custodian(s) responsible for each;

D. Ordering an accounting and the imposition of a constructive trust over the profits, revenues, equity, investments, license consideration, milestone and royalty rights, and other benefits Defendants have obtained through their misappropriation and other wrongful conduct;

E. Ordering Defendants to assign to Beam all right, title, and interest in any patent, patent application, or other intellectual property derived from or embodying Beam's trade secret or confidential information, or inventions Wang was obligated to assign to Beam, including Chinese Patent Application No. 202210725548.7, any patent issued therefrom, and all members of its patent family and all related applications and counterparts;

F. Awarding Beam compensatory damages for its actual losses, in an amount to be determined at trial;

G. Awarding Beam damages for Defendants' unjust enrichment to the extent not addressed in computing damages for actual loss, or, in the alternative, a royalty for Defendants' unauthorized disclosure and use of the Beam Trade Secrets, pursuant to 18 U.S.C. § 1836(b)(3)(B) and Mass. Gen. Laws c. 93, § 42 et seq.;

H. Awarding Beam exemplary damages up to twice the amount of the damages for Defendants' willful and malicious misappropriation pursuant to Mass. Gen. Laws c. 93, § 42 et seq.;

I. Awarding Beam exemplary damages up to twice the amount of the damages for Defendants' willful and malicious misappropriation, pursuant to 18 U.S.C. § 1836(b)(3)(C);

J. Awarding Beam up to treble damages, and its reasonable attorneys' fees and costs, pursuant to Mass. Gen. Laws c. 93A, § 11;

K. Ordering disgorgement of all compensation paid by Beam to Dr. Wang during the period of her disloyalty, and of all profits, equity, and benefits she obtained through that disloyalty;

L. Awarding Beam its reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and as otherwise permitted by law;

M. Awarding Beam pre-judgment and post-judgment interest at the maximum rates allowed by law; and

N. Granting such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Beam Therapeutics Inc. hereby demands a trial by jury on all issues so triable.

Dated: September 25, 2026

Respectfully submitted,

BEAM THERAPEUTICS INC.,
By its attorneys,

/s/ *Eric J. Marandett*

Eric J. Marandett (BBO No. 561730)
emarandett@choate.com
Anita M. C. Spieth (BBO No. 676302)
aspieth@choate.com
Marta Garcia Daneshvar (BBO No. 708800)
mgarcia@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel: (617) 248-5000